HARRY J. GRANT, JOHN DONALD FERGUSON, IRWIN MAIER, DONALD B. ABERT AND PETER KING, AS TRUSTEES OF THE TRUST UNDER JOURNAL EMPLOYEES' STOCK TRUST AGREEMENT DATED MAY 15, 1937, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 86493.   Filed July 26, 1962.

*Richard B. Barker, Esq.,* and *Edmund B. Shea, Esq.,* for the petitioner.

*Rex A. Guest, Esq.,* for the respondent.

MULRONEY, *Judge:* The respondent determined deficiencies of $21,318 in the petitioner's income tax for each of the years 1956 and 1957. The sole issue is whether petitioner realized taxable income in each of the years 1956 and 1957 through certain stock acquisitions.

### FINDINGS OF FACT.

Some of the facts were stipulated and they are herein included by this reference.

Petitioner is a trust created under an agreement dated May 15, 1937, entitled "Journal Employees' Stock Trust Agreement" hereinafter called the trust. Petitioner filed a Federal fiduciary income tax return for the years 1956 and 1957 with the district director of internal revenue for the district of Wisconsin, at Milwaukee.

During the years 1953 through 1957 the Journal Company was a Wisconsin corporation engaged in the business of publishing the Milwaukee Journal and operating television and radio stations. Its outstanding capital stock during this period consisted of 600,000 shares of common stock with a par value of $1 per share.

The trust created by the trust agreement on May 15, 1937, was established by certain stockholders of the Journal Company for the purpose of enabling employees of that corporation to acquire and hold during the period of their employment a beneficial interest in shares of common stock of the Journal Company. The trust agreement stated, in section 2, that its provisions were:

intended to promote and facilitate the acquisition and ownership of a beneficial interest in Journal stock by employee-eligibles [all persons employed by the

Journal Company] and to promote stability and continuity of management and control of the Company in the interest of the Company, the stockholder-eligibles [certain persons named as first parties in the trust agreement, so long as they held Journal stock, and their successors] and the employee-eligibles through the instrumentality of the trust hereinafter created.

When the trust was created in 1937 the several stockholders in the Journal Company conveyed 30,000 shares of stock in the Journal Company to the trust and in exchange therefor they received certificates evidencing 30,000 units of beneficial interest in the stock placed in trust.

The 30,000 shares of Journal stock initially transferred to the trust, as well as other shares of Journal stock subsequently transferred to the trust, were designated under the trust agreement as the Capital Stock Fund.

Section 4 of the trust agreement provided, as follows:

4: *Units of Beneficial Interest, Trust Certificates.* The beneficial interests in the Capital Stock Fund shall be divided into 30,000 equal parts called "units." The trustees shall from time to time increase or decrease the number of units into which the Capital Stock Fund shall be divided, to accord in so far as may be practicable with the number of shares of Journal stock held by them hereunder. Units shall be evidenced by certificates, called "trust certificates," issued by the trustees.

The units of beneficial interest were then sold by the stockholders to employees of the Journal Company, who held such units subject to the conditions in the trust agreement. The Journal Company employees holding such units of beneficial interest are hereinafter sometimes called unit holders.

Each unit holder had the right to vote, through proxies, the number of shares of Journal stock represented by the units owned by him.

The rights of unit holders to transfer the units were limited by certain provisions of the trust agreement which required, in effect, that when any unit holder became separated from the employment of the Journal Company by reason of death, retirement, resignation, or discharge (which events were called "option events"), the units held by such individual became subject to purchase by other employees of the Journal Company under options defined in the trust agreement at a price determined by formula as of the date of separation from employment. The formula provided in effect that the price per unit would be the book value per share of the Journal Company stock outstanding, plus three times the average annual earnings per share during the 5 preceding years.

Section 10 of the trust agreement defined the classes of optionees as follows:

10: *Options With Respect to Units Owned by Employee-Eligibles and Ex-Employee-Eligibles.* Options to purchase all or any of the units made available through the happening of an option event, by depositing at the office of the

trustees in cash the option price determined according to the formula set forth in Section 11, together with interest thereon as provided in Section 13, within the period of time limited below, shall be vested in each of the following classes of optionees successively:

*Class A Optionees.* For a period of six months after the happening of an option event, such employee-eligible or eligibles, excluding the President, either concurrently or successively, for such number of units and for such period or periods not exceeding six months, as may be designated in writing by the President to the trustees.

*Class B Optionees.* For a period of two months after the expiration of the time limited to Class A Optionees, such employee-eligible or eligibles, including the President, either concurrently or successively, for such number of units and for such period or periods not exceeding two months, as may be designated in writing by the Board of Directors to the trustees.

*Class C Optionees.* For a period of four months after the expiration of the time limited to Class B Optionees, stockholder-eligibles, with the right as among themselves to purchase the units available to them in proportion to the number of shares of Journal stock owned by them respectively, together with their respective proportions of such units not purchased by any of their number.

*Class D Optionee.* For a period of five years after the expiration of the time limited to Class C Optionees, the Company.

Section 12 of the trust agreement provided for restrictions on the transfer of units, as follows:

12: *Restrictions on Transfer of Units.* Unless and until units owned by an employee-eligible or by an ex-employee-eligible shall have become subject to purchase under the options provided in Section 10 and said options shall have been exercised or shall have expired without having been exercised, no sale, transfer or other disposition of such units or the trust certificates evidencing the same shall be valid or effective for any purpose whatsoever except as provided in Sections 15 and 16. Nothing in this Agreement shall be deemed to prohibit an eligible, other than an employee-eligible or ex-employee-eligible, from assigning or otherwise disposing of any unit owned by him to any other eligible.

Section 20 of the trust agreement provided, in part, as follows:

20: *Disposition of Income.* The trustees shall pay over, as soon as practicable after receipt, all income from the Capital Stock Fund, including such bonds or notes of the Company, if any, as may be received in lieu of current income, less such sums as they may deem necessary to provide for the payment of taxes and expenses of administering the Capital Stock Fund, to owners of units in proportion to the number of units owned by them respectively, provided, however, that if the trustees shall receive any distribution representing the sale, liquidation or other realization of any department or other substantial portion of the business of the Company, they shall pay over to the owners of units, as aforesaid, only so much of such distribution received by the trustees as shall bear to the whole thereof the same ratio as an amount equal to the net book value of the book assets so sold, liquidated or otherwise realized upon at the close of the calendar month next preceding such sale, liquidation or other realization, plus three times the average annual earnings of the Company available for dividends, which are attributable to such department or portion of the business, during the five fiscal years next preceding said sale, liquidation or other realization, shall bear to the total amount realized by the Company on account of such sale, liquidation or other realization. * * *

Subsequent to May 15, 1937, certain stockholders of the Journal Company conveyed additional shares of Journal stock to the trust in exchange for certificates evidencing units of beneficial interest in such stock and the stockholders then sold such units to employees of the Journal Company at a price determined under the trust agreement formula. By the end of 1953 the trust held 330,000 (55 percent) out of the 600,000 issued and outstanding shares of the Journal Company.

Prior to July 24, 1953, the Journal Company entered into negotiations with the Wilmington Trust Company, Wilmington, Delaware, for the purchase of Journal stock held by the Wilmington Trust Company as trustee of certain trusts. No employee of the Journal Company was a beneficiary under these trusts of which the Wilmington Trust Company was trustee. The Journal Company sought to purchase its stock from the Wilmington Trust Company at the formula price under the trust agreement which at that time was approximately $26 per share, while the Wilmington Trust Company asked for $40 per share. The negotiations were conducted on behalf of the Journal Company by Irwin Maier, president and publisher, Donald Abert, business manager, Peter King, treasurer, and Edmund B. Shea, counsel for the Journal Company. The Journal Company was interested in acquiring its stock from the Wilmington Trust Company because it wanted to prevent a sale of such stock on the open market and because it wanted to enlarge the ownership of Journal stock among its employee group.

On July 24, 1953, a special meeting of the stockholders of the Journal Company was held, at which the articles of incorporation of the Journal Company were amended (by unanimous action of stockholders voting) to provide, as follows:

RESOLVED that the provisions of ARTICLE THIRD of the company's Articles of Incorporation be and they are hereby amended by adding thereto the following provisions:

The board of directors of the corporation shall have authority to acquire by purchase from time to time any shares of its issued and outstanding capital stock for such consideration and upon such terms and conditions as the board of directors in its discretion shall deem proper and reasonable in the interest of the corporation; and in respect of the shares of its own capital stock so acquired by the corporation, no stockholder of the corporation shall be entitled as a matter of preemptive right to subscribe for, purchase or receive any portion thereof; and in respect of shares of its own capital stock so acquired by the corporation the board of directors shall have authority in its discretion:

(i) to cancel and retire all or any part of such shares, or

(ii) to retain as treasury stock all or any part of such shares, or

(iii) To convert all or any part of such shares of stock into units of beneficial interest in capital stock of the corporation pursuant to the provisions of *The Journal Employees Stock Trust Agreement Dated May 15, 1937, between Harry J. Grant, Faye McBeath and others, as settlors, and Harry J. Grant, L. A. Webster, J. D. Ferguson, L. L. Bowyer and Marvin H. Creager as*

*trustees, and The Journal Company* and (without first offering the same for purchase by stockholders) to sell such units of beneficial interest in capital stock of the corporation to employees of the corporation eligible under said Stock Trust Agreement to hold units of beneficial interest in such stock; provided however that the price payable for each such unit of beneficial interest in capital stock of the corporation sold by the corporation to any of its employees shall be the "option price" thereof (as defined in said Stock Trust Agreement) prevailing at the time of sale in each case, determined in the manner prescribed in the Stock Trust Agreement aforesaid.

By four separate agreements each dated July 24, 1953, the Journal Company contracted to purchase from the Wilmington Trust Company 75,000 shares of capital stock of the Journal Company to be delivered and paid for in five annual installments of 15,000 shares on December 1 in each of the years 1954 through 1958. The purchase price per share of the stock comprising each installment was an amount equal to $3 in addition to the option price of a unit of beneficial interest in the trust determined in accordance with the formula set forth in section 25 of the trust agreement computed as of the delivery date.

On August 26, 1954, the trustees of the trust adopted a resolution creating and setting aside 75,000 units of beneficial interest in the trust for issuance in installments to the Journal Company in exchange for the 75,000 shares of Journal stock which the Journal Company had contracted to purchase from the Wilmington Trust Company.

The following resolutions were adopted on November 26, 1954, at a special meeting of the board of directors of the Journal Company:

Whereas The Journal Company has contracted to acquire by purchase on December 1, 1954, 15,000 shares of Journal Company common stock, under purchase agreements dated July 24, 1953 between The Journal Company and Wilmington Trust Company, as trustee,

Resolved that the proper officers of the Company be and they are hereby authorized and directed to transfer said 15,000 shares of stock, when received, to the trustees under *Journal Employees Stock Trust Agreement dated May 15, 1937* in exchange for trust certificates to be issued by said trustees, to The Journal Company or its nominees, evidencing 15,000 units of beneficial interest in Journal Company stock under said trust agreement.

The following resolution offered by Miss McBeath was adopted by unanimous vote:

Whereas written offers, each in the form of "Exhibit X" hereto attached, have been received by The Journal Company from sundry employees, for purchasing the aggregate number of 15,000 units of beneficial interest in Journal Company stock, evidenced by trust certificates issued by the trustees under *Journal Employees Stock Trust Agreement dated May 15, 1937,* for the price and upon the terms and conditions set forth in said offers, and

Whereas there has been presented to this meeting a list of the employees by whom the written offers aforesaid have been submitted, showing the number of units of beneficial interest in Journal Company stock subscribed for by each of said employees;

And it appearing that each of the employees named in said list is an "employee eligible" as defined in said Stock Trust Agreement; and

Whereas it is deemed desirable and in the interest of the company that said proposals be accepted,

Resolved that the proper officers of the company be and they are authorized on behalf of The Journal Company to accept each and all of said written offers and to make delivery of trust certificates accordingly upon payment of the purchase price in each case; subject however to the condition that none of said offers shall be accepted unless nor until The Journal Company shall have received delivery of the shares of capital stock which the company is entitled to receive on December 1, 1954 from Wilmington Trust Company under purchase agreements dated July 24, 1953.

Similar resolutions of authorizations were adopted by the board of directors of the Journal Company at special meetings held on November 25, 1955, November 23, 1956, and November 25, 1957.

On December 1, 1954, pursuant to the agreement dated July 24, 1953, the Wilmington Trust Company delivered to the Journal Company 15,000 shares of Journal stock and received in payment $32.92 per share, which was $3 per share over the option price ($29.92) of a unit of beneficial interest in the trust computed under the trust agreement formula as of December 1, 1954. On the same date the Journal Company transferred the 15,000 shares of its stock to the trust in exchange for certificates of beneficial interest in the trust evidencing 15,000 units of beneficial interest. On the same date the Journal Company sold all of said 15,000 units of beneficial interest to its employees for $29.88 per unit, which was the estimated option price computed under the formula as of that date. Of the 15,000 units sold to the employees, 14,745 units were sold to employees who were at that time holders of units of beneficial interest in the trust.

On December 1, 1955, the Journal Company acquired an additional 15,000 shares of its stock from the Wilmington Trust Company at $35.97 per share, which was equal to $3 over the option price ($32.97) computed as of that date under the trust agreement formula. On the same date the Journal Company transferred the 15,000 shares of Journal stock to the trust in exchange for certificates of beneficial interest in the trust evidencing 15,000 units of beneficial interest in the trust, which the Journal Company sold on the same day to its employees at $32.97 per unit. Of the 15,000 units sold to Journal employees, 14,890 units were sold to employees who were holders of units of beneficial interest in the trust.

On December 1, 1956, the Journal Company acquired an additional 15,000 shares of its stock from the Wilmington Trust Company at $39.15 per share, which was equal to $3 over the option price ($36.15) of a unit of beneficial interest in the trust computed under the trust agreement formula as of that date. The Journal Company transferred the 15,000 shares on the same date to the trust in exchange for certificates of beneficial interest in the trust evidencing 15,000 units

of beneficial interest, which the Journal Company sold on the same date to its employees for $36.15 per unit. Of the 15,000 units so sold to Journal employees, 14,165 units were sold to employees who were holders of units of beneficial interest in the trust. The difference between the amount paid to the Wilmington Trust Company for the 15,000 shares of stock delivered on December 1, 1956, and the amount received from the sale of the 15,000 units of beneficial interest, which amounted to $45,000, was charged to surplus on the books and records of the Journal Company.

On December 1, 1957, the Journal Company acquired an additional 15,000 shares of its stock from the Wilmington Trust Company at $41.60 per share, which was equal to $3 over the option price ($38.60) of a unit of beneficial interest in the trust computed under the trust agreement as of that date. On the same date the Journal Company transferred the 15,000 shares of its stock to the trust in exchange for certificates of beneficial interest in the trust evidencing 15,000 units of beneficial interest, which the Journal Company sold on the same date to its employees for $38.60 per unit. Of the 15,000 units so sold to Journal employees, 14,530 units were sold to employees who were holders of units of beneficial interest in the trust. The difference between the amount paid to the Wilmington Trust Company for the 15,000 shares of stock and the amount received from the sale of the 15,000 units of beneficial interest, which amounted to $45,000, was charged to surplus on the books and records of the Journal Company.

With respect to the units of beneficial interest received by the Journal Company on December 1 of each of the years 1954 through 1957 in exchange for the shares of stock transferred to the trust on those dates, there were no provisions in the trust agreements restricting or in anyway limiting the price for which such units could have been sold by the Journal Company to its employees.

On December 1, 1956, immediately preceding the sale of 15,000 units by the Journal Company to its employees, there were 862 unit holders owning 360,000 units. Of these units the trustees of the trust and the officers and directors of the Journal Company owned 82,260 units and the other 841 employees of the Journal Company owned 277,740 units. On December 1, 1957, immediately preceding the sale of 15,000 units by the Journal Company to its employees, there were 909 unit holders owning 375,000 units. Of these units the trustees of the trust and the officers and directors of the Journal Company owned 85,400 units and the other 888 employees of the Journal Company owned 289,600 units.

The 1956 fiduciary income tax return filed by the trust showed a gross income of $922,500, all of which was dividend income, and it also showed a deduction for distributions to beneficiaries in the amount of $922,500. The 1957 fiduciary income tax return filed by the trust

showed a gross income of $960,000, all of which was dividend income, and it also showed a deduction for distributions to beneficiaries in the amount of $960,000. Respondent determined that the trust realized income in the nature of a distribution from the Journal Company in the amount of $45,000 in each of the years 1956 and 1957, with the explanation that in each of those years, "$45,000.00 represents a net cost incurred by The Journal Company for the purpose of enabling you to acquire 15,000 shares of The Journal Company stock."

OPINION.

By pleading admissions it is established that the trust was formed for the purpose of enabling employees of the Journal Company to acquire and hold, during the periods of their employment, a beneficial interest in shares of capital stock of the Journal Company. The direct sale of its stock by the Journal Company to its employees would not accomplish this result for it would not confine future stockholders to employees. The trust entity was merely a facility in conventional form used to effectuate the underlying purpose of lodging the beneficial interest and control of the Journal Company in its active employees. The trust held legal title to the stock transferred to it but that is about all for it could not vote the stock or retain any dividends. By issuing trust certificates for each share with rights and restrictions as to transfer it merely implemented the plan of placing and keeping the beneficial interest in the Journal Company in its active employees.

We just cannot perceive any theory on which to found an argument that the trust received income by reason of the transactions whereby the Journal Company bought its stock, transferred it to the trust for trust certificates, and sold the trust certificates to employees.

As we read respondent's brief he seems to contend that the petitioner trust received dividend income upon the net effect of the entire transaction whereby the trust, as the majority stockholder of the Journal Company, caused the corporation in "a prearranged and preconceived scheme" to contract for the purchase of Journal stock from the Wilmington Trust Company "fully intending the stock to be acquired by [the petitioner trust] and a portion of the cost to be borne by The Journal Company." Respondent then argues that viewing the transaction as a whole "no other conclusion can be reached than that corporate funds to the extent of $3.00 per share were siphoned from The Journal Company for the benefit of its major stockholder [the petitioner trust] in partial payment of the cost of stock acquired by [the petitioner trust]."

There is no merit in this contention. The trust may have been the major stockholder but it could not, as a stockholder, cause the corporation to do anything. It could not vote the stock it held. The trust

received no benefit at all from the transactions. The fact that the Journal Company saw fit to sell the certificates to its employees (some but not all of whom were former certificate holders) at a price less than it paid for stock is immaterial. The Journal Company bestowed no benefit on the trust by such sales.[1] In fact, it might be said the trust suffered a detriment for the stock it held was reduced in book value by the reduction of the Journal Company's surplus by $45,000 each year.

Under respondent's theory the so-called dividend distribution is from the Journal Company to the trust. The Journal Company's action in selling the trust certificates at the formula-computed price ($3 less than the cost per share of the stock) might have benefited company employees but it was certainly of no benefit to the trust.

We hold that the petitioner trust did not realize dividend income in 1956 and 1957 as a result of the transactions outlined above.

*Decision will be entered for the petitioner.*

---

[1] There was no limitation as to the price at which it could sell the certificates.

